

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

FJN:SK/ADW/EMR
F.#2015R00471 / OCDETF #NY-NYE-777

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 28, 2025

<u>By ECF</u>

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  <u>United States v. Rafael Caro Quintero</u>
       <u>Criminal Case No. 15-208 (S-3) (FB)</u>

Dear Judge Levy:

    The government respectfully submits this memorandum in support of its application for a permanent order of detention for the defendant Rafael Caro Quintero, also known as "RCQ," "Cesar," "Don Rafa," "Rafa," "El Senor," "28," "R1," "Compa," "El Hombre," "El Pleve," "El Canoso," "El Crespo," and "the Old Man," the leader of the Caro Quintero Drug Trafficking Organization, a violent drug trafficking organization based in Mexico.  The defendant was arrested by Mexican authorities on July 15, 2022.  He was expelled from Mexico to the United States on February 27, 2025, and is scheduled to appear before the Court tomorrow for an arraignment on the Third Superseding Indictment (the "S-3 Indictment") in this case.  For the reasons set forth below, at his arraignment, the Court should enter a permanent order of detention, as no condition or combination of conditions can assure the safety of the community or the defendant's appearance at trial.

STATEMENT OF FACTS

I.  Caro Quintero's Leadership of the Guadalajara Cartel[1]

The defendant Rafael Caro Quintero is one of the most notorious drug lords of the modern era.  Starting at least as early as January 1980, the defendant led a powerful international drug trafficking organization based in Mexico (the "Caro Quintero DTO").  During its earliest iteration, the Caro Quintero DTO was part of the Guadalajara Cartel, also known as "La Federación," which later evolved into the modern day Sinaloa Cartel, the largest drug trafficking organization in the world.  The defendant co-founded the Guadalajara Cartel with several other major drug traffickers, and it was the dominant drug cartel in Mexico throughout the 1980s.  The Caro Quintero DTO and other groups under the Guadalajara Cartel umbrella trafficked enormous quantities of marijuana and cocaine into the United States.  Indeed, the Guadalajara Cartel partnered with Colombian cocaine manufacturers and pioneered the trafficking of cocaine through Central America and Mexico into the United States.  The defendant's prolific drug trafficking eventually earned him the nickname "El Narco de Narcos," or "the Narco of Narcos."  The Caro Quintero DTO also trafficked large amounts of heroin and methamphetamine into the United States.

In the 1980s, the defendant was especially known for his trafficking of multi-ton quantities of marijuana, which was grown on large plantations.  Between 1980 and 1985, the defendant controlled marijuana plantations in the Mexican states of Chihuahua, Sonora, and Sinaloa.  Each plantation was thousands of hectares in size and worked by thousands of workers.  Guards armed with pistols and AK-47s oversaw the plantations.

The defendant routinely enforced discipline over the Caro Quintero DTO through violence.  For example, the defendant has admitted to co-conspirators and associates that he punished workers who stole from him or betrayed him with beatings and death.  In 1984, one or more witnesses observed a security guard execute a worker accused of stealing from the defendant by shooting him in the head.  In another instance in 1984, one or more witnesses saw the body of a dead man with his hands tied behind his back at Rancho Bufalo, another marijuana plantation controlled by the defendant.

As part of his efforts to protect the Caro Quintero DTO, the defendant ordered the murder of a law enforcement agent.  Drug Enforcement Administration ("DEA") Special Agent Enrique "Kiki" Camarena was assigned to the DEA resident office in Guadalajara, Mexico in the early 1980s.  The defendant believed that Camarena was responsible for leading the Mexican

---

[1] As permitted by the Second Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention.  See United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000); United States v. Ferranti, 66 F. 3d 540, 542 (2d Cir. 1995).  As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all the evidence of which the government is aware or which it will seek to introduce at trial.

government to seize Caro Quintero's largest ranch in Chihuahua, the Rancho Buffalo. In February 1985, Special Agent Camarena was kidnapped, tortured, and murdered by members of the Caro Quintero DTO. Later in 1985, the defendant was arrested and convicted in Mexico for his role in the deaths of Special Agent Camarena and three other people. A Mexican court sentenced the defendant to 40 years' imprisonment, but he was released from prison before serving his full sentence.

II.     Caro Quintero's Leadership of the Caro Quintero DTO from Prison

During his imprisonment, the defendant continued to direct the activities of the Caro Quintero DTO by giving orders to family members and associates. Indeed, the Caro Quintero DTO continued to operate enormous marijuana plantations while the defendant was in prison, and the defendant personally directed others regarding the production and transportation of marijuana, which was often transported via small airplanes and trucks. The defendant also conferred with co-conspirators about smuggling cocaine into the United States, the proceeds of which were shared with the defendant due to his role as the leader of the DTO.

In 2013, a Mexican state court ordered the defendant's premature release from prison, though a Mexican federal court issued a new arrest warrant just days after the defendant's release. After his release, the defendant immediately went into hiding and continued to personally lead the Caro Quintero DTO.

III.    Caro Quintero's Leadership of the Caro Quintero DTO After His Release from Prison

After the defendant's release from prison in 2013, the defendant continued to lead the Caro Quintero DTO. Because a new arrest warrant had been issued for the defendant in Mexico, other members of the Caro Quintero DTO went to great lengths to protect the defendant from being recaptured. Indeed, the defendant avoided using phones or electronic communications and usually only agreed to in-person meetings through intermediaries. For example, in June 2016, two co-conspirators boarded a plane at a private airstrip in Sonora, which then flew for several hours to a location in Sinaloa. Upon landing, an armed member of the Caro Quintero DTO met the two co-conspirators and drove the two co-conspirators to a ranch, where the defendant was waiting. The co-conspirators then spoke to the defendant about smuggling heroin and marijuana to the United States. During that conversation, the defendant explained that he would continue to traffic drugs so he could earn money that would allow him to continue living in the mountains and avoid the Mexican authorities. The defendant also asked the co-conspirators about new drug routes to the United States and potential buyers in the United States. As of 2016, the Caro Quintero DTO had distribution networks in various parts of the United States, including New York City, Arizona, and elsewhere.

Intercepted electronic messages also show that after the defendant's release, the Caro Quintero DTO continued to traffic large quantities of controlled substances. Members of the Caro Quintero DTO also continued to possess and use firearms to further their drug trafficking activities after the defendant's release in 2013. Additionally, in 2016, the defendant ordered the murder of a co-conspirator who the defendant believed to be cooperating with U.S.

law enforcement.  Members of the Caro Quintero DTO searched for the co-conspirator but were unable to locate him.

    IV.        Foreign Authorities' Arrest and Expulsion of Caro Quintero

On July 26, 2018, a grand jury sitting in the Eastern District of New York returned the S-3 Indictment.  Count One charges the defendant with leading a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a), 848(b), and 848(c).  Counts Two and Three charge the defendant with conspiring to distribute cocaine, heroin, methamphetamine, and marijuana, knowing and having reasonable cause to believe that those drugs would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 959(d), 960(a)(3), 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(1)(G), 960(b)(1)(H) and 963.  Count Four charges the defendant with the use of firearms in furtherance of his drug trafficking crimes, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii) and 924(c)(1)(A)(iii).  Count One carries a mandatory minimum sentence of life imprisonment, and the possibility of the death penalty, if the defendant is convicted.  Each of Counts Two, Three, and Four carries a mandatory minimum of 10 years' imprisonment and a statutory maximum of life imprisonment.

On July 15, 2022, Mexican law enforcement authorities arrested the defendant in Mexico.  The defendant was expelled from Mexico and arrived in the Eastern District of New York on February 27, 2025.

ARGUMENT

I.        Legal Standards

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., a federal court must order a defendant detained pending trial where it determines that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).  A presumption of dangerousness and risk of flight arises when a defendant is charged with an offense under the Controlled Substances Act or the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of 10 years or more and the Court finds probable cause to believe that the defendant committed such offense.  18 U.S.C. § 3142(e)(3)(A).  Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question.  See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3124(e)(3).  The defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight."  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam).  If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight.  See 18 U.S.C.

4

§ 3142(f); Mercedes, 254 F.3d at 436; United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). Indeed—and significantly—danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). In considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable incentive to flee," United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993), as does the possibility of a severe sentence, see Jackson, 823 F.2d at 7; United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); see also United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

Courts consider several factors in making the determination of whether pretrial detention is appropriate: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. See 18 U.S.C. § 3142(g). Even where the defendant has met his burden of production to rebut the statutory presumption in favor of detention, the presumption also remains a factor for the Court to consider. Mercedes, 254 F.3d at 436.

II.    A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no condition or combination of conditions will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, because the defendant is charged with multiple counts under the Controlled Substances Import and Export Act that carry extensive punishments, he is presumed to pose a danger to the community and a risk of flight. Accordingly, the defendant bears the initial burden of showing that he is not a danger to the community or a flight risk. For the reasons set forth below, the defendant cannot sustain that burden.

III.   Caro Quintero Is a Danger to the Community

The facts and circumstances of this case compel the defendant's detention, as the relevant Bail Reform Act factors show that he poses an extraordinary danger to the community.

The counts with which the defendant is charged—leading a continuing criminal enterprise, participating in an international narcotics importation and distribution conspiracy and carrying firearms in furtherance of that conspiracy—are extremely serious. The top count carries a mandatory minimum sentence of life imprisonment, with the possibility of the death penalty, if the defendant is convicted, while each of the other counts carries a 10-year mandatory minimum

5

prison sentence. See 21 U.S.C. §§ 848, 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(1)(G) and 960(b)(1)(H); 18 U.S.C. § 924(c).

For more than four decades, the defendant personally led a prolific drug trafficking organization that was first part of the Guadalajara Cartel and later the Sinaloa Cartel, two of the most powerful drug trafficking cartels the world has ever seen.  The defendant oversaw the production of many thousands of kilograms of marijuana on sprawling plantations.  Eventually, the Caro Quintero DTO started to traffic large amounts of cocaine, heroin, and methamphetamine, extending the wealth and power of the organization.  And to protect his operation, the defendant used violence freely.  In addition to ordering beatings and executions of workers suspected of stealing or being disloyal, the defendant went so far as to participate in the kidnapping, torture, and murder of a DEA agent.  Yet even after his conviction by a Mexican court for several murders, the defendant continued to lead the Caro Quintero DTO from prison, directing others through intermediaries.  And after the defendant's release from prison in 2013, he led the organization from the mountains of Sinaloa, all while going to great lengths to avoid detection and capture.  Indeed, in 2016, the defendant ordered the murder of an individual who he believed to be cooperating against him.

Put simply, the defendant is one of the most significant drug traffickers of the modern era.  The defendant earned his nickname "El Narco de Narcos" through the pioneering role he occupied in establishing the Guadalajara Cartel, which later became the Sinaloa Cartel.  During his decades of drug trafficking, the defendant not only flooded American streets with large amounts of cocaine, marijuana, methamphetamine, and heroin, but he also used murder as a tool to protect his organization.  Because no combination of release conditions can adequately protect the community from the defendant, he should be ordered detained pending trial.

IV.     Caro Quintero Poses a Significant Risk of Flight

Similarly, the defendant cannot overcome the presumption that he is a risk of flight, for several reasons.

First, all of the counts charged in the S-3 Indictment against the defendant carry a significant punishment.  Indeed, if convicted of Count One, the defendant's minimum term of imprisonment will be life, and if convicted, he may face the death penalty.  Given the significant consequences that the defendant faces upon conviction, he has a strong incentive to flee the jurisdiction.  See Jackson, 823 F.2d at 7 (prospect of severe sentence creates incentive to flee); Martir, 782 F.2d at 1147 (charges with significant maximum terms created potent incentive to flee); Cisneros, 328 F.3d at 618 (seriousness of charges gave defendant strong incentive to abscond).

Second, the defendant has previously fled from prosecution for an extended period.  Between 2013 and 2022, the defendant lived in the mountains of Sinaloa, moving between safehouses and relying on his underlings to protect him from capture.  The defendant avoided using phones and arranged for meetings through intermediaries at remote locations, illustrating the steps he is willing to take to avoid prosecution.

Third, the defendant's personal history and characteristics demonstrate that he is a significant flight risk. The defendant has no known personal ties to the United States and has been brought to the United States for the sole purpose of facing criminal prosecution. He has no legal status in this country. Given his absence of any connection to the United States (aside from his drug trafficking activities) and his extensive ties to Mexico, the defendant constitutes a significant risk of flight.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court order the defendant to be detained permanently pending trial, as there is no condition or combination of conditions that could reasonably assure the safety of the community or the defendant's appearance at trial.

    Respectfully submitted,

    JOHN J. DURHAM
    United States Attorney

By:    /s/Andrew D. Wang
    Saritha Komatireddy
    Francisco J. Navarro
    Erin M. Reid
    Andrew D. Wang
    Assistant United States Attorneys
    (718) 254-7000