FJN:ADW/CWE/MG/KPO
F. #2015R00471

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

UNITED STATES OF AMERICA

    - against -

RAFAEL CARO QUINTERO,
    also known as "RCQ," "Cesar,"
    "Don Rafa," "Rafa," "El Senor," "28,"
    "R1," "Compa," "El Hombre," "El
    Pleve," "El Canoso," "El Crespo" and
    "the Old Man," and
ISMAEL QUINTERO ARELLANES,
    also known as "Fierro,"

         Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

No. 15-CR-208 (S-3) (FB)


THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Francisco J. Navarro
Andrew D. Wang
Chand W. Edwards-Balfour
Miranda Gonzalez
Katherine P. Onyshko
Assistant U.S. Attorneys
    (Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................. 2

    I.     The Charged Crimes .............................................................................. 2

    II.    Caro Quintero's History of Interference with the Judicial Process ....................... 4

    III.   Caro Quintero's Ability to Harm or Influence the Jury ....................................... 5

    IV.   Widespread Media Coverage ............................................................................... 5

ARGUMENT ..................................................................................................... 7

    I.     Legal Standard ...................................................................................... 7

    II.    Discussion ............................................................................................ 11

           A.    The Seriousness of the Charges Against the Defendants Weighs in Favor of an Anonymous and Partially Sequestered Jury ......................................... 12

           B.    The Defendants' Past Interference With and Present Means to Interfere with the Judicial Process Support Anonymity and Partial Sequestration .. 12

           C.    Extensive Press Coverage Justifies an Anonymous and Partially Sequestered Jury ................................................................................ 15

           D.    Protection of the Defendants' Rights ...................................................... 17

CONCLUSION .................................................................................................. 19

Page(s)

Cases

United States v. Amuso,
  21 F.3d 1251 (2d Cir. 1994) .................................................................................................. 8

United States v. Ashburn,
  No. 13-CR-0303 (NGG), 2014 WL 5800280 (E.D.N.Y. Nov. 7, 2014) .................................. 9

United States v. Aulicino,
  44 F.3d 1102 (2d Cir. 1995) ........................................................................................... 8, 9, 10

United States v. Barnes,
  604 F.2d 121 (2d Cir. 1979) ........................................................................................... 8, 16

United States v. Cacace,
  No. 08-CR-240 (BMC), 2013 WL 4775531 (E.D.N.Y. Sept. 6, 2013) ................................... 17

United States v. Dervishaj,
  No. 13-CR-668 (ENV), 2015 WL 13842838 (E.D.N.Y. Mar. 19, 2015) ................................ 19

United States v. Galestro,
  No. 06-CR-285 (ARR), 2008 WL 2783359 (E.D.N.Y. July 15, 2008) ................................... 18

United States v. Garcia Luna,
  No. 19-CR-576 (BMC), 2022 WL 2441228 (E.D.N.Y. July 5, 2022) .................................... 10

United States v. Gotti,
  459 F.3d 296 (2d Cir. 2006) ........................................................................................... 8, 14

United States v. Guzman Loera,
  No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018).. ........................................................... passim

United States v. Ibrahim,
  529 F. App'x 59 (2d Cir. 2013) ............................................................................................ 8

United States v. Jordan,
  No. 20-CR-305 (LDH) (E.D.N.Y. Jan. 13, 2023)……….................................................. 2, 11

United States v. Kadir,
  718 F.3d 115 (2d Cir. 2013) ........................................................................................... passim

United States v. Kaziu,
  559 F. App'x 32 (2d Cir. 2014) ............................................................................................ 8

United States v. Kelly,
    No. 19-CR-286 (AMD), 2020 WL 8482693 (E.D.N.Y. Oct. 8, 2020)............................ passim

United States v. Locascio,
    6 F.3d 924 (2d Cir. 1993) ............................................................................................. 8

United States v. Mayes,
    No. 12-CR-385 (ARR), 2013 WL 6175824 (E.D.N.Y. Nov. 25, 2013).................................. 13

United States v. Napout,
    963 F.3d 163 (2d Cir. 2020) ....................................................................................... 7

United States v. Paccione,
    949 F.2d 1183 (2d Cir. 1991) .............................................................................. passim

United States v. Persico,
    832 F.2d 705 (2d Cir. 1987) ....................................................................................... 8

United States v. Persico,
    No. 10-CR-147 (SLT), 2012 WL 1188243 (E.D.N.Y. Apr. 6, 2012) ....................................... 9

United States v. Pica,
    692 F.3d 79 (2d Cir. 2012) .................................................................................. 8, 10

United States v. Prado,
    634 F. App'x 323 (2d Cir. 2016) ................................................................................ 7

United States v. Quinones,
    511 F.3d 289 (2d Cir. 2007) ....................................................................................... 8

United States v. Shiomos,
    864 F.2d 16 (3d Cir. 1988) ....................................................................................... 16

United States v. Shkreli,
    No. 15-CR-637 (KAM) (E.D.N.Y. June 25, 2017)… ............................................................ 16

United States v. Stewart,
    590 F.3d 93 (2d Cir. 2008) ....................................................................................... 15

United States v. Thai,
    29 F.3d 785 (2d Cir. 1994) ....................................................................................... 8

United States v. Thomas,
    757 F.2d 1359 (2d Cir. 1985) .............................................................................. 8, 12

United States v. Tutino,
    883 F.2d 1125 (2d Cir. 1989) .............................................................................. 8, 12

United States v. Vario,
 943 F.2d 236 (2d Cir. 1991) ........................................................................ 8, 14, 15

United States v. Wilson,
 493 F. Supp. 2d 397 (E.D.N.Y. 2006) ..................................................... 9, 10, 12, 17

United States v. Wong,
 40 F.3d 1347 (2d Cir. 1994) ...................................................................... 8, 9, 16

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in this case. Specifically, the government requests that: (1) the names, addresses and workplaces of members of both the venire and petit juries not be revealed to the parties or their attorneys; and (2) the jurors be transported to and from the courthouse by the U.S. Marshals Service ("USMS") each trial day and be sequestered from the public while in the courthouse during each trial day.

These limited measures are necessary to protect the integrity of the trial and the jury's impartiality by preventing harassment, intimidation, or other interference with the jurors— and, just as importantly, by mitigating any fear in the minds of the jurors of any such harassment, intimidation, or other interference. As the Court is aware from previous filings, this case involves exceptionally serious charges; defendant Rafael Caro Quintero has the means to interfere with the judicial process and has an extensive history of doing so (<u>e.g.</u>, the murder of a U.S. federal agent; continued criminal conduct while in a Mexican prison; post-release efforts to avoid detection and arrest with the help of co-defendant Ismael Quintero Arellanes; and a history of employing hitmen against those who betray the organization); and this case has drawn intense media scrutiny. <u>See, e.g.</u>, Government's Memorandum of Law in Support of Pretrial Detention of Rafael Caro Quintero, ECF No. 87 ("Caro Quintero Detention Memo") at 2-4; Government's Memorandum of Law in Support of Pretrial Detention of Ismael Quintero Arellanes, ECF No. 74 ("Quintero Arellanes Detention Memo") at 4-5 (together, the "Detention Memos"). Each of these facts lends support for an anonymous and partially sequestered jury.

Moreover, because the Court can take reasonable precautions to minimize the risk of prejudice from an anonymous and partially sequestered jury, including instructing the jury that anonymity and partial sequestration are routine and designed to protect jurors' privacy, there is no

risk that the defendants' fundamental rights will be infringed.  Finally, this case presents many of the same "strong and credible reasons to believe that the jury needs protection" that judges in this District have found compelling in numerous trials including: (a) the trial of Sinaloa Cartel leader Joaquin Guzman Loera ("El Chapo"), see United States v. Guzman Loera, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018), (b) the trial of top Mexican law enforcement official Genao Garcia Luna, see United States v. Garcia Luna, No. 19-CR-576 (BMC) (E.D.N.Y. July 5, 2022), (c) the trial of Robert Sylvester Kelly ("R. Kelly"), see United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 8482693, at *1 (E.D.N.Y. Oct. 8, 2020), and (d) the trial of Karl Jordan, Jr. and Ronald Washington for the murder of Run-D.M.C. deejay Jason Mizell, see United States v. Jordan, No. 20-CR-305 (LDH) (E.D.N.Y. Jan. 13, 2023).  Accordingly, and for the reasons set forth below, the government respectfully requests that the Court grant its motion for an anonymous and partially sequestered jury.

BACKGROUND

## I.     The Charged Crimes

The defendant Rafael Caro Quintero ("Caro Quintero") is one of the most notorious drug lords of the modern era.  Starting at least as early as January 1980, Caro Quintero led a sprawling and powerful international drug trafficking organization based in Mexico (the "Caro Quintero DTO").  During its earliest iteration, the Caro Quintero DTO was part of the Guadalajara Cartel, also known as "La Federación," which later evolved into the modern-day Sinaloa Cartel, the largest drug trafficking organization in the world.  Caro Quintero co-founded the Guadalajara Cartel with several other major drug traffickers, and it was the dominant drug cartel in Mexico throughout the 1980s.  The Caro Quintero DTO and other groups under the Guadalajara Cartel umbrella trafficked enormous quantities of marijuana and cocaine into the United States.  Indeed, the Guadalajara Cartel partnered with Colombian cocaine manufacturers and pioneered the

2

trafficking of cocaine through Central America and Mexico into the United States. Caro Quintero's prolific drug trafficking eventually earned him the nickname "El Narco de Narcos," or "the Narco of Narcos." The Caro Quintero DTO also trafficked large amounts of heroin and methamphetamine into the United States.

Ismael Quintero Arellanes ("Quintero Arellanes") was a high-ranking lieutenant within the Caro Quintero DTO and served as Caro Quintero's personal head of security. Days after Caro Quintero's release from prison in Mexico in 2013, the government of Mexico issued an arrest warrant for Caro Quintero. From that moment, until Caro Quintero was recaptured by Mexican authorities in 2022, he remained a fugitive from justice. Throughout the time that Caro Quintero remained a fugitive, Quintero Arellanes and other members of the Caro Quintero DTO went to great lengths to protect Caro Quintero from being recaptured. For example, Quintero Arellanes frequently acted as an intermediary for Caro Quintero by relaying messages and orders to other members of the Caro Quintero DTO via an electronic messaging program. This arrangement reflected concern within the Caro Quintero DTO that Caro Quintero's direct use of telephones or messaging applications would expose him to law enforcement detection. Quintero Arellanes's electronic messages also show that he was responsible for detecting possible efforts by Mexican authorities to capture Caro Quintero and warning other members of the Caro Quintero DTO accordingly. Further, Quintero Arellanes was directly involved in trafficking large quantities of controlled substances on behalf of the Caro Quintero DTO.

On July 26, 2018, a grand jury sitting in the Eastern District of New York returned the third superseding indictment in United States v. Rafael Caro Quintero, et al., No. 15-CR-208 (S-3) (FB) (the "Indictment"). ECF No. 55. The Indictment alleges almost four decades' worth of criminal conduct, charging Caro Quintero with: (1) leading a continuing criminal enterprise

based on his role as the leader of the Caro Quintero DTO (Count One); (2) two counts of conspiring to distribute cocaine, heroin, methamphetamine, and marijuana, knowing and having reasonable cause to believe these drugs would be unlawfully imported into the United States (Counts Two and Three); and (3) the use of firearms in furtherance with the drug trafficking crimes in Counts Two and Three (Count Four). The CCE count contains ten violations, including violations for various distributions of cocaine, methamphetamine, and marijuana, and one violation of murder conspiracy. Quintero Arellanes is charged in Counts Two through Four.

II.   Caro Quintero's History of Interference with the Judicial Process

As the government has previously detailed, Caro Quintero's history of criminal activity has included the perpetuation of drug trafficking and violence in Mexico and the United States. Caro Quintero oversaw the production of many thousands of kilograms of marijuana on sprawling plantations. Eventually, the Caro Quintero DTO started to traffic large amounts of cocaine, heroin, and methamphetamine, extending the wealth and power of the organization.

The Caro Quintero DTO has employed extreme violence. In addition to ordering beatings and executions of workers suspected of being disloyal, Caro Quintero went so far as to participate in the kidnapping, torture, and murder of Drug Enforcement Administration ("DEA") Special Agent Enrique "Kiki" Camarena in 1985. Yet even after Caro Quintero's conviction by a Mexican court, Caro Quintero continued to lead the Caro Quintero DTO from prison, directing others through intermediaries. Specifically, after Caro Quintero's release from prison in 2013 and while he remained a fugitive from justice, he led the organization from the mountains of Sinaloa, all while going to great lengths to avoid detection and capture, with help from Quintero Arellanes. During this time, Caro Quintero also sought revenge on those who he believed had betrayed him— for example, in 2016, Caro Quintero ordered the murder of an individual who he believed to be cooperating against him. As Caro Quintero's personal head of security, Quintero Arellanes relayed

messages and orders between Caro Quintero and other members of the organization to facilitate drug trafficking activities and to enable Caro Quintero to avoid capture. Quintero Arellanes was consistently equipped with firearms, including assault rifles, as well as two firearms that he nicknamed "cop killers." See, e.g., Caro Quintero Detention Memo at 2-4; Quintero Arellanes Detention Memo at 4-5.

III. Caro Quintero's Ability to Harm or Influence the Jury

Caro Quintero has demonstrated the ability to bring substantial resources to bear, even while confined, in his efforts to subvert justice. As noted above, while Caro Quintero was incarcerated in a prison in Mexico, he continued to lead the Caro Quintero DTO from prison, directing others through intermediaries. For example, Caro Quintero gave orders to subordinates regarding the operation of marijuana ranches and the distribution of drug proceeds, thus demonstrating that Caro Quintero has, can, and will engage in serious criminal conduct through third parties while imprisoned. Caro Quintero also possesses the financial means to procure assistance in interfering with the judicial process. Indeed, the government has identified and seized several properties purchased by Caro Quintero using cash proceeds of his illegal drug activity, some of which were strategically purchased in the names of his family members to avoid detection and forfeiture. See United States v. The Real Property and Premises Known as Deed No. 18,877, et al., No. 19-CV-5748 (ENV) (E.D.N.Y. Apr. 15, 2021), ECF No. 11. Accordingly, given the high-profile nature of Caro Quintero and his extensive ties to one of the world's most dangerous criminal organizations, jurors may not be willing or able to provide impartial verdicts if their identities are publicly known.

IV. Widespread Media Coverage

This case has engendered substantial international and domestic media coverage and public interest. Even before Quintero Arellanes's extradition to the United States in 2023 and

Caro Quintero's transfer to the United States in 2025, there was extensive coverage of their crimes.[1] The interest in the Caro Quintero DTO has only intensified in the wake of the defendants' arrests. Hundreds of articles about the defendants have been published in a wide array of major news outlets in this country and others following the defendants' arrivals in the United States.[2] Unlike most cases, moreover, the interests of the public and the press have continued through the Court's resolution of legal motions and procedural matters, with the jury box full of reporters and sketch artists at even routine status hearings.[3] This coverage is not limited to domestic media

---

[1]    See, e.g., José de Córdoba, "Mexico Captures Drug Lord Rafael Caro Quintero, Convicted in Killing of DEA Agent," Wall Street Journal (July 15, 2022), available at https://www.wsj.com/world/americas/mexico-captures-drug-lord-rafael-caro-quintero-convicted-in-killing-of-dea-agent-11657919154; Andrew Denney, "Prosecutors charge nephew of infamous Sinaloa drug lord for trafficking ring," New York Post (Feb. 10, 2020), available at https://nypost.com/2020/02/10/ prosecutors-charge-nephew-of-infamous-sinaloa-drug-lord-for-trafficking-ring; Jo Tuckman, "Fugitive Mexican drug lord Rafael Caro Quintero pleads for a 'second chance,'" VICE (July 24, 2016), available at https://www.vice.com/en/article/ fugitive-mexican- drug-lord-rafael-caro-quintero-pleads-for-a-second-chance/; Dolia Estevez, "Was Mexican Fugitive Caro Quintero The First Billionaire Drug Lord?" Forbes (Oct. 1, 2013), available at https://www.forbes.com/sites/ doliaestevez/2013/10/01/was-mexican-fugitive-caro-quintero-the-first-billionaire-drug-lord/; "Mexico court frees drugs kingpin Rafael Caro Quintero," BBC News (Aug. 9, 2013), available at https://www.bbc.com/news/world-latin-america-23642506; William A. Orme Jr., "Mexican Drug Kingpin's Jailbreak Plan Foiled," Washington Post (Oct. 9, 1987), available at https://www.washingtonpost.com/archive/ politics/1987/10/10/mexican-drug-kingpins-jailbreak-plan-foiled/c983fddb-0133-4319-b9a5-6d08ff56fe6a/.

[2]    See, e.g., Pablo Ferri, "Caro Quintero's life behind bars: The story of Mexico's 'Narco of Narcos,'" El País (June 30, 2025), available at https://english.elpais. com/international/2025-06-30/caro-quinteros-life-behind-bars-the-story-of-mexicos-narco-of-narcos.html; Santul Nerkar and Alan Feuer, "After Extraordinary Step by Mexico, Drug Lord Appears in New York Court," New York Times (Feb. 28, 2025), available at https://www.nytimes.com/2025/02/28/nyregion/rafael-caro-quintero-mexican-drug-lord-arraigned.html; "US to seek extradition of Mexican drug kingpin's nephew," Seattle Times (Feb. 10, 2020), available at https://www.seattletimes.com/nation-world/nation/us-to-seek-extradition-of-mexican-drug-kingpins-nephew/.

[3]    See, e.g., Luc Cohen, "Alleged Mexican drug lord Rafael Quintero in plea talks in US," Reuters (Mar. 20, 2026), available at https://www.reuters.com/legal/government/alleged-mexican-drug-lord-rafael-caro-quintero-plea-talks-us-2026-03-19; Matias Civita, "Caro Quintero

6

outlets, as the Mexican news media has published numerous articles on this prosecution.[4] Public

interest is also likely to remain high given that, even apart from press coverage, Netflix has a

television series chronicling Caro Quintero's drug trafficking career and the Caro Quintero DTO.[5]

This widespread and intense press coverage has continued to the present and is

likely to continue, and only increase, up to and during trial. The expected media attention may put

significant pressure on jurors to reach a verdict based on considerations other than the evidence

presented at trial, for example, to either avoid the notoriety associated with the Caro Quintero DTO

or to seek out fame.

ARGUMENT

I.     Legal Standard

The Second Circuit has long recognized that anonymous juries are often necessary

to protect the integrity of a trial and to ensure an impartial jury. See, e.g., United States v. Napout,

963 F.3d 163, 189 (2d Cir. 2020); United States v. Prado, 634 F. App'x 323, 325 (2d Cir. 2016);

---

Breaks Silence: Mexican Drug Lord Behind Kiki Camerena's Murder Speaks Out from U.S. Prison," Latin Times (Aug. 8, 2025), available at https://www.latintimes.com/caro-quintero-breaks-silence-mexican-drug-lord-behind-kiki-camarenas-murder-speaks-out-us-588190.

[4]     See, e.g., "Caro Quintero negocia un acuerdo de culpabilidad con la fiscalía en Estados Unidos," El Economista (Mar. 19, 2026), available at https://www.eleconomista.com.mx /politica/caro-quintero-negocia-acuerdo-culpabilidad-fiscalia-estados-unidos-20260319-804959. html; "El Mayo, Caro y El Viceroy libran la pena de muerte," El Universal (Aug. 6, 2025), available at https://www.eluniversal.com.mx/nacion/el-mayo-caro-y-el-viceroy-libran-la-pena-de-muerte/; "Ismael, sobrino de Caro Quintero, se presentó en la audiencia del 'Narco de Narcos, en Nueva York," Vanguardia MX (Mar. 26, 2025), available at https://vanguardia.com.mx/ noticias/internacional/ismael-sobrino-de-caro-quintero-se-presento-en-la-audiencia-del-narco-de-narcos-en-nueva-york-NA15402438; Anel Tello, "'El Fierro': el sobrino de Rafael Caro Quintero que también enfrenta cargos en el Distrito Este de Nueva York," Milenio (Oct. 13, 2025), available at https://www.milenio.com/policia/ismael-quintero-el-sobrino-del-narco-de-narcos-bajo-custodia-de- eu.

[5]     See Narcos: Mexico (Netflix stream, Feb. 13, 2020).

7

United States v. Kaziu, 559 F. App'x 32, 38 (2d Cir. 2014); United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013); United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

Anonymous juries are necessary when potential jurors are vulnerable to pressure and influence by "defendants' friends or enemies, or harassment by the public." Vario, 943 F.2d at 240 (internal quotation marks and citation omitted). The Second Circuit has also indicated that even where such improper influence does not occur, jurors' awareness that their identities are publicly known may impair their impartiality, justifying anonymity as a means of ensuring an impartial jury. See Barnes, 604 F.2d at 141 ("If the anonymous juror feels less pressure as the result of anonymity, this is as it should be a factor contributing to his impartiality.") (internal quotation marks and citation omitted).

To determine whether to use an anonymous jury, a district court must undertake a two-step inquiry. First, the court should determine whether there is "strong reason to believe that the jury needs protection." Pica, 692 F.3d at 88. Second, if the court determines that anonymity

is necessary to protect the jury, the court should take "reasonable precautions to minimize any prejudice that might arise from an anonymous jury." Id.

With respect to the first prong of the inquiry, courts in this Circuit have considered several factors in weighing whether the jury needs protection, including: (1) "the dangerousness of the defendant, demonstrated by the seriousness of the charged crimes, including whether the defendant is charged with participating in a large-scale criminal enterprise, and the defendant's criminal history"; (2) "whether the defendant or his associates have engaged in past attempts to interfere with the judicial process"; (3) "whether the defendant has access to the means to harm the jury"; and (4) "whether the trial is likely to attract media attention and publicity." United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006). In weighing those factors, the court may rely on the government's proffer of facts showing that the jury needs protection. See United States v. Persico, No. 10-CR-147 (SLT), 2012 WL 1188243, at *1 (E.D.N.Y. Apr. 6, 2012) (citing Wong, 40 F.3d at 1376-77). Notably, all of these factors need not be present; "anonymity is appropriate when some combination of these factors is present." United States v. Ashburn, No. 13-CR-0303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014) (internal quotation marks omitted).

As for the second prong of the test for empaneling an anonymous jury—the requirement of "reasonable precautions to minimize any prejudicial effects on the defendant"— the Second Circuit has explained that the court should "conduct a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself," and reduce the possibility that the jury will infer that the defendants are dangerous by providing the jurors a "plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures." Paccione, 949 F.2d at 1192; see also Aulicino, 44 F.3d at 1116. An anonymous and partially sequestered jury may be informed, for example, that "the reason for their anonymity and partial

9

sequestration is to maintain their personal privacy and their ability to render a fair verdict in light of [] media and public attention," and that the reason for transportation provided by the USMS is "to protect their privacy and to ensure a timely start to each day of what promises to be a long trial." Wilson, 493 F. Supp. 2d at 401 (citing Aulicino, 44 F.3d at 1116); see also Kelly, 2020 WL 8482693, at *3 ("[T]he Court will explain that anonymous jurors are commonplace in high profile cases because of media interest, and that anonymity will protect the jurors' privacy and to enable them to discharge their responsibilities as jurors in an independent, impartial and fair manner.").

"Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Pica, 692 F. 3d at 88 (internal quotation marks and citation omitted). Considering these same factors, courts in this District have empaneled anonymous and partially sequestered juries in similar cases. As noted above, this procedure was used in Guzman Loera ("El Chapo"), finding that the pattern of violence employed by the defendant and his co-conspirators, the existence of dangerous individuals who claimed to want to help the defendant, and the significant media attention warranted an anonymous jury. See Guzman Loera, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018), ECF No. 187 at 3. In Garcia Luna, which involved the prosecution of a high-ranking Mexican law enforcement officer, the court granted the use of an anonymous and partially sequestered jury based on (1) the defendant's facilitation of the Sinaloa Cartel's drug smuggling and violence by providing the Sinaloa Cartel with information and protection at a high level, (2) the defendant's deep ties to the Mexican government and the Sinaloa Cartel that gave him "the intent and resources to engage in witness intimidation and harassment," and (3) the "substantial press coverage" about the defendant's arrest. United States v. Garcia Luna, No. 19-CR-576 (BMC), 2022 WL 2441228, at *2 (E.D.N.Y. July 5, 2022).

10

Anonymous and partially sequestered juries have been utilized in other cases involving widespread media attention. For instance, in the trial of R. Kelly, the court granted the government's motion for an anonymous and partially sequestered jury where the defendant, a famous musician, had engaged in an enterprise to recruit women and girls to engage in illicit sexual activity, secured witnesses' silence, suborned perjury and attempted to influence a jury in a previous trial. See Kelly, 2020 WL 8482693, at *1-2. More recently, in a trial against two defendants charged with murdering deejay Jason Mizell of hip hop group Run-D.M.C., the court determined that an anonymous and partially sequestered jury was warranted because of the seriousness of the charges, the defendants' history of attempts to interfere with the judicial process including intimidation of witnesses and using a family member to engage in similar behavior, the ability by one of the defendants to tamper with the jury based on his possession of a contraband phone in prison, and the significant press coverage in the case. See Jan. 13, 2022 Tr. Status Conference, United States v. Karl Jordan, Jr., et al., No. 20-CR-305 (S-2) (LDH) (E.D.N.Y. Jan. 13, 2022).

II.     Discussion

Applying the standards and considering the facts set forth above, the government respectfully submits that it is necessary to keep anonymous and not reveal the names, addresses, and other identifying information of both the venire and the final jurors, as well as to require that the jury be partially sequestered during the trial.[6]

---

[6]     The government also submits, however, that it is appropriate for the USMS, which will be responsible for maintaining the safety and security of the jury during the course of the trial, to know the names and addresses of the jurors. The USMS will keep that information confidential and will not reveal it to counsel for the government, the defense, or any other third party.

A. The Seriousness of the Charges Against the Defendants Weighs in Favor of an Anonymous and Partially Sequestered Jury

The defendants are charged with exceptionally serious crimes. Count One of the Indictment alleges that Caro Quintero engaged in a continuing criminal enterprise running the Caro Quintero DTO, a charge which carries a mandatory minimum sentence of life imprisonment. Moreover, Count One includes allegations regarding Caro Quintero's conspiracy to murder persons who posed a threat to the Caro Quintero DTO. See Indictment ¶ 17; see id. ¶ 5 (describing Caro Quintero's use of hitmen to carry out acts of violence on behalf of the Caro Quintero DTO). The remainder of the charges include the distribution of extremely large quantities of cocaine, heroin, methamphetamine, and marijuana into the United States and the use of firearms in the commission of those offenses. Quintero Arellanes faces a combined mandatory minimum sentence of 20 years' imprisonment if convicted of Counts Two through Four based on his role as a high-ranking lieutenant within the Caro Quintero DTO, including through his assistance of its massive drug trafficking operation and his use of firearms to support those operations. Thus, the allegations in the Indictment establish the potential dangerousness of both defendants, as "demonstrated by the seriousness of the charged crimes, including whether the defendant[s] [are] charged with participating in a large-scale criminal enterprise." Wilson, 493 F. Supp. 2d at 398 (citing Paccione, 949 F.2d at 1192; Tutino, 883 F.2d at 1132; and Thomas, 757 F.2d at 1364-65).

B. The Defendants' Past Interference With and Present Means to Interfere with the Judicial Process Support Anonymity and Partial Sequestration

As detailed above, the defendants have a history of interference with the judicial process and the means to interfere with the judicial process in the future. Specifically, Caro Quintero was a senior leader and member of one of the largest drug cartels in history, which is a designated foreign terrorist organization; has spent years hiding from justice; has operated his organization both while in and out of custody; and has employed violence, kidnapping, and torture

12

through third parties to retaliate against witnesses and law enforcement. As part of his efforts to protect his drug trafficking organization, Caro Quintero ordered the kidnapping, torture, and murder of DEA Special Agent Camarena, who was assigned to the DEA resident office in Guadalajara, Mexico, in the early 1980s. Caro Quintero believed that Special Agent Camarena was responsible for leading the Mexican government to seize Caro Quintero's marijuana ranch in Chihuahua, Mexico, the Rancho Búfalo.

During his imprisonment in Mexico, Caro Quintero continued to run his drug trafficking organization through family members. The government anticipates that the evidence at trial will establish that when Caro Quintero was in prison, he met with co-conspirators to direct the operation of the Caro Quintero DTO. After Caro Quintero's release from prison in 2013, he immediately went into hiding and continued to personally lead his drug trafficking organization, including with the help of Quintero Arellanes. In 2016, Caro Quintero authorized the murder of a co-conspirator who Caro Quintero believed to be cooperating with U.S. law enforcement against his organization. Throughout this time period, Caro Quintero utilized cartel members, such as his lieutenant and personal head of security Quintero Arellanes, to coordinate drug trafficking, serve as protection for the DTO, and to avoid detection from law enforcement authorities. See Caro Quintero Detention Memo at 2-4; Quintero Arellanes Detention Memo at 3-4.

This conduct supports an anonymous and partially sequestered jury, even though charges of obstruction of justice have not been filed against the defendants. See, e.g., United States v. Mayes, No. 12-CR-385 (ARR), 2013 WL 6175824, at *4-5 (E.D.N.Y. Nov. 25, 2013) (empaneling anonymous and partially sequestered jury based in part on government's proffer of obstructive conduct even though "the defendants are not charged in the indictment with witness tampering, jury tampering, or obstruction of justice"). Additionally, the Second Circuit has

approved the use of anonymous and partially sequestered juries in other instances where the scale of a defendant's criminal organization provides its affiliates with a well-connected network, where the defendant and his associates have shown a likelihood of obstruction of justice, and where the pattern of violence by the defendant's criminal associates may cause a juror to reasonably fear his safety. See, e.g., Gotti, 459 F.3d at 345-46 (defendant's membership in powerful crime organization is factor supporting anonymous jury); Vario, 943 F.2d at 240 (while mere invocation of organized crime is not sufficient to justify anonymous jury, a defendant's connection to a broader criminal enterprise may merit anonymous jury where there is a "demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendant and his associates such as would cause a juror to reasonably fear for his own safety").

As previously set forth in the Detention Memos, Caro Quintero led a sprawling drug trafficking enterprise with legions of members, including high-ranking member Quintero Arellanes. The Caro Quintero DTO propagated extreme violence in Mexico and distributed massive amounts of narcotics into the United States. In short, Caro Quintero has a long and storied history of interference with the judicial process in Mexico and he has the means to do so in this case, even in the United States. See Guzman Loera, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018), ECF No. 187 at 3 ("Given the length and breadth of defendant's alleged continuing criminal enterprise – which the Government asserts took place over 25 years and two continents – defendant's claim that the activities of his associates and allies are limited to Mexico is simply not credible."). Jury members could reasonably fear for their safety if their identity is publicly known, and in addition, even absent actual risk to the jurors, potential jurors may fear retaliation from the defendants' associates—and therefore may be unable to adequately perform their duties as

jurors—if their identities are publicly available.  See United States v. Stewart, 590 F.3d 93, 125 (2d Cir. 2008) (upholding use of anonymous jury in part because there was "widespread pretrial publicity" and there was "the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety); Vario, 943 F.2d at 241 ("trial evidence [depicting] a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety" and "would be sufficient in and of itself in an appropriate case to warrant an anonymous jury regardless of whether the defendant was a reputed mobster or associated with a recognized organized crime family").  As such, this factor supports anonymity and partial sequestration.

> C.  Extensive Press Coverage Justifies an Anonymous and Partially Sequestered Jury

The intense media scrutiny that this case has received and will continue to receive is the final factor in support of an anonymous and partially sequestered jury.  See Kadir, 718 F.3d at 121 (observing that "extensive media coverage" is a "significant" factor in considering whether to empanel an anonymous jury).  As set forth above, numerous press reports have been published around the world documenting the defendants' roles in the Caro Quintero DTO, including their drug trafficking activities, the murder of a DEA agent, the arrests and transfers of the defendants to the United States, court appearances, and even legal filings in this case.  Domestic publications such as the New York Times, New York Post, Washington Post, and Seattle Times have reported extensively on this case, which has many times been "front page news."  Paccione, 949 F.2d at 1193.  Members of the press both appeared outside of the courthouse and filled the gallery at every in-person court appearance.

The anticipated press coverage of the defendants' trial is likely to be substantial and strongly supports the anonymity and partial sequestration requested in this motion.  Notably, courts have ordered anonymous juries in cases with substantial media coverage, even where neither the

defendant nor his associates had any documented history of jury tampering. See Kadir, 718 F.3d at 121 (affirming court's decision to empanel an anonymous jury where defendants were charged with violent crime and there was extensive media coverage of the case (citing Wong, 40 F.3d at 1377); see also United States v. Shiomos, 864 F.2d 16, 17 (3d Cir. 1988) (affirming decision to sequester jury in trial of judge accused of extortion on ground that trial would generate "significant amounts of publicity" that would interfere with the jury's ability to remain impartial). In Barnes, the Second Circuit upheld the empaneling of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141. The fact that jurors are aware that their identities are public may subtly or unconsciously impair their impartiality in a case with this degree of media attention. Cf. United States v. Shkreli, No. 15-CR-637 (KAM) (E.D.N.Y. June 25, 2017), ECF No. 259 (observing that in a "high profile case in which there has been ongoing pre-trial media coverage," disclosure of juror names would increase the risk that jurors would fear the pressure of public identification and "not be candid"). Anonymity and partial sequestration will also protect jurors from inappropriate contact. See Paccione, 949 F.2d at 1193 (stating that the anonymity and partial sequestration were appropriate because the "case had been front-page news and that the trial could be expected to be the subject of extensive publicity, exposing the jurors to inappropriate contacts that could compromise the trial").

Accordingly, to preserve their impartiality and ability to fairly consider the evidence without fear of public intrusion or reprisal, and to prevent inappropriate contact, the jurors' identities should be anonymous as to the public, and they should be kept together during lunch recesses and transported by the USMS to and from an undisclosed location each trial day.

See, e.g., Kelly, 2020 WL 8482693, at \*4 ("Partial sequestration will keep members of the media and the general public from following jurors as they enter and leave the courthouse, protect the jurors from inappropriate and potentially harassing or intimidating contact, and prevent jurors from obtaining information that is not in the record.").

D.      Protection of the Defendants' Rights

The Court can take simple precautions to ensure that the relief requested by the government will not infringe upon the defendants' rights. See Kadir, 718 F.3d at 120 (explaining that if a "district court determines that an anonymous jury is appropriate, the court must take reasonable precautions to minimize any prejudicial effects on the defendant and to ensure protection of his fundamental rights") (internal quotation marks and citation omitted). As in Guzman Loera, "any potential prejudice to [the] defendant[s] will be mitigated when the Court advises the jury that their names are not being publicly disclosed out of respect and concern for their privacy, which is true, and that neither the Government nor [the] defendant[s] will know their identities." Guzman Loera, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018), ECF No. 187 at 4. These precautions will ensure that "any potential prejudice to [the] defendant[s] will be mitigated[.]"

As the Second Circuit has explained, a defendant has two concerns that are potentially impacted by a decision to empanel an anonymous jury: (1) the right to make informed choices during the jury selection process; and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity. See Wilson, 493 F. Supp. 2d at 401. The first concern can be alleviated using a jury questionnaire as well as a thorough and probing voir dire. Courts have found a jury questionnaire is an appropriate means of minimizing potential prejudice to a defendant when an anonymous jury is empaneled in a case with intense media scrutiny. See, e.g., United States v. Cacace, No. 08-CR-240 (BMC), 2013 WL 4775531, at \*5 (E.D.N.Y. Sept. 6,

2013). The second concern can be alleviated by informing the jurors that partial anonymity is being ordered to protect their privacy, which the Second Circuit has expressly sanctioned as an appropriate "plausible and nonprejudicial" reason for not disclosing jurors' identities. Kadir, 718 F.3d at 120-21 (upholding decision where court instructed the jury that, "given the media interest in this case, anonymity would protect the jurors' rights of privacy and assist them in discharging [their] responsibility as jurors independently, fairly and impartially") (internal quotation marks and citation omitted, alterations in original). The Court can also explain jurors' partial anonymity by telling prospective jurors, accurately, that anonymity would allow them to feel more comfortable in giving candid answers to the questions asked in voir dire. Either of those examples would provide a credible explanation to prospective jurors in this case.

As for partial sequestration, the government proposes that the jurors be told that they are being escorted in and out of the courthouse to protect their privacy and in order to ensure a timely start to each day of trial.[7] This practice has been routinely followed in this District in recent years, and should be followed here as well. See, e.g., Guzman Loera, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018), ECF No. 187 at 4 ("The Court will instruct the jurors that their daily transportation and escort within the courthouse are provided to protect their privacy and to ensure that the trial proceeds expeditiously."); United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL 2783359, at *3 n.3 (E.D.N.Y. July 15, 2008) ("Jurors are generally told that such steps are not unusual and are taken to ensure their privacy and impartiality in light of the media and

---

[7] The Court can also provide similar instructions for any other security measures that the USMS might employ which might be apparent to the jury (as opposed to, for example, "behind the scenes" monitoring and security assessments that the USMS may conduct which will not be noticed by jurors and therefore do not need to be explained to them). In order for the Court to craft such instructions, the government proposes that it and the USMS brief the Court, ex parte, shortly before jury selection concerning the specific security measures that the USMS intends to employ regarding jury security.

public attention the trial is expected to receive."); <u>see also</u> <u>Kelly</u>, 2020 WL 8482693, at *4; <u>United States v. Dervishaj</u>, No. 13-CR-668 (ENV), 2015 WL 13842838, at *5 (E.D.N.Y. Mar. 19, 2015).

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the Court grant the government's motion for an anonymous and partially sequestered jury.

Dated:      Brooklyn, New York
           June 16, 2026

                          Respectfully submitted,

                          JOSEPH NOCELLA, JR.
                          United States Attorney
                          Eastern District of New York

By:     /s/ Miranda Gonzalez
        Francisco J. Navarro
        Andrew D. Wang
        Chand W. Edwards-Balfour
        Miranda Gonzalez
        Katherine P. Onyshko
        Assistant United States Attorneys
        (718) 254-7000

cc:   All counsel (by ECF)

19